I might be in for petitioner Dan Cook in this capital habeas corpus case. I think that the case consideration has to start with the Maskey confession and the claims that it either affects or directly relates to, because this case was all about Maskey's testimony, what it meant, what it didn't mean, whether it was constitutionally challengeable, how did it impact on some of the other cases, and I think that's what we're going to look at today. I'm not sure that you're supposed to get anything out of the video, Your Honor, in the sense of a specific comment or a specific aspect of his confession or a specific part of his story. I think what you're supposed to get out of his confession, video or otherwise, is the fact that he was frozen to that statement by virtue of the consistency plea agreement from that day forward, irrespective of whether what he said was right or wrong. Well, but in watching the video, he's obviously tired at certain points, and I think that you talk about intoxication relative to Cook and relative to Mr. Maskey, but I also noticed in that video, he's not an unintelligent person. And he also, too, that the officer's very low key, and Mr. Maskey on occasion will correct him when the officer says something, you know, might have said something, and he'll go, no, no, no, no, that was that, I'm talking about the other day, or I'm talking about at such and such a time, or no, I did. So I didn't get out of it that he just said, you know, that the officer was asking these leading questions or that Mr. Maskey just, if the officer said something, that he just bought it hook, line, and sinker, because Mr. Maskey was pretty specific about correcting the officer on very subtle points. Yes, Your Honor, but we're not talking, for example, about whether that was a voluntary statement. What we are talking about is could my client be prosecuted and convicted in effect by playing that and not giving my client an effective opportunity to cross-examine. That's what I think the essence of the Maskey tape is about and how that then affects some of the other claims. I don't understand your argument about failure to have an opportunity to cross-examine. Well, yes. Maskey testified. Of course he testified, and he was cross-examined to a degree. But, Your Honor, he was sitting in a witness chair over there, knowing that the judge who was in front of him had said to him that I'm giving you this plea agreement because it's important to me that we have a case against Mr. Cook. He didn't say it verbatim, but he said it in so many words in the sentencing. He knew that he wasn't simply obliged to testify truthfully. Yes, that is in there. He was obliged to testify consistently with what he had said. That is something I'd like to pursue with you, paragraph 3 of the plea agreement. I have to say that just speaking for myself, I find the end of that paragraph to be exceedingly troubling. That is that if he testifies inconsistently, the agreement is off regardless of which statement was false. Yes. It essentially says to him, stick with your story. Absolutely. That's what you have to do. And it's thereby inconsistent with the requirement that he speak truthfully. Absolutely. My issue, though, is what Supreme Court case tells us that that's a problem? We are looking through, you know, at this, and the Supreme Court has recently reminded us in Kerry v. If there's no Supreme Court case, there can't be an unreasonable interpretation of a Supreme Court case. Well, there's also the unreasonable refusal to extend an established principle, and I think the established principle here starts with Mooney way back in 1935 and goes forward. And I was looking again at Mooney yesterday, and it's something that I hadn't thought about for a while, and that is that Mooney said that it was a violation of due process to offer a perjured testimony. And what it said was if it is wrong to offer testimony that is intimidated, then of course it is wrong to offer testimony that is perjured. Well, that's its reasoning, but I – No, I think it was the holding. I really do. I mean, obviously, I believe, Your Honor, you have expressed the issue, because in my humble opinion, if you read the record in this case and if you look at the provision of the plea agreement that you've just quoted to me, and if you remember what Maskey said in the post-conviction testimony and his lawyer, it was very clear to them, his lawyer advised him, he read the plea agreement that way, and it was very clear to him and to Maskey that he had no latitude. Well, but the way I read that, or I'm going to make an argument of the way to read it, is as a prosecutor, okay, you know, the guy, you know, Maskey gets a sweet deal. I mean, what, 20 years or whatever, he gets a second degree or whatever. And they don't want to live up to that if he's got inconsistent statements, and what that basically said is, we don't have to prove which one's true or false. Your deal's off. It really goes to his deal being off, not to that you don't have to tell the truth. It's like, we're just not, we're not going to, if they're mutually, if you say mutually exclusive things, your deal's off. And then you're looking at a capital case, again, as far as that goes. I don't think it tells him, it says previously about you've got to testify truthfully, but then it goes to that. If you're inconsistent and it's essentially mutually exclusive, we don't have to decide which one's true or false. Your deal's off. You lose your deal. That certainly could be and probably was the prosecutor's motivation. But before us is the issue of what was the impact on Mr. Maskey. Was the impact as devastating upon him as I contend that he was? And I contend that the only reasonable interpretation of the facts of the impact on him is that that was indeed the case. Well, give me a better idea so I can understand your argument. What is the devastation that you talk about? What difference would it make if that language were deleted? He knew that, number one, not only that the plea bargain was going to be taken back, but he had been told by the child judge that I would have no hesitation to sentence you to death. He basically said you have avoided an almost certain death sentence. Yeah, but we're talking about the limitation on cross-examination of Maskey. That's the focus of your argument. Yes. And the question I have is what could Maskey or what is the ratio of what Maskey would have said if that last paragraph weren't in? Well, in the record are two letters that Maskey sent to Cook basically saying get the plea bargain set aside and I will fix it. How that really should be weighed in the balance, I don't know. Your first claim on appeal is that just the agreement itself was a violation of due process because it coerced the witness. Yes. And I'm trying to look for prejudice with respect to that. What is your showing? And, of course, I cannot make the kind of showing that I would like to, and I say that that is because of the problem that's there. When was Maskey able to give any sort of a hint in any kind of detail about what he would say? However, let me repeat. Well, what indication is there in the record that he wasn't telling the truth? Okay, your client says, you know, I'll pay the devils what the government's going to say, that the evidence was overwhelming. The jury found your client guilty in, what, an hour on two homicides, that your client, it was admitted into evidence that he did confess, although it certainly wasn't at the length that Maskey testified. But it's not inconsistent with what Maskey said. The physical evidence corroborates what Mr. Maskey says. No, it doesn't, Your Honor. With all due respect, if you look at the fingerprint expert and if you look at the injuries occurred and the deaths occurred, they do not in any way, shape, or form tie them to my client versus Mr. Maskey. If you take Mr. Maskey out of the equation, and if you take the admission that you just referred to. Well, what about the injuries that they have in terms of how Mr. Maskey described that they, you know, that they tied them up. He says they're in the closet, so they're in the closet, right? Yes. I mean, there's. . . There's they. You say they, Your Honor. Excuse me for interrupting. I apologize. But that's the point. And you asked, if I may, you asked what evidence is there in the record that he was not telling the truth. Look at my supplemental reply brief. Maskey told the cop before he was put on videotape that he had killed Sweeney with a pipe. He testified, or he, in his confession and testimony, he said with a bed sheet, a bed sheet. He said that he had lured the first victim to the apartment with beer and a pornographic magazine. In one statement, he testified that the victim was already there in his confession. He testified that another witness named Della Heiser had gone inside the apartment at the time just after the murders. She testified that she did not. He said that he had moved the first victim's body while, that Cook moved the first victim's body while Maskey was outside. And then he told the cops that he himself had put the victim's body on a bed. He denied that on the Monday afterwards that he went to his place of employment and scratched the victim's name off the work schedule, laughing and saying that it looks like he was going to have more hours. He denied that. The supervisor testified that he did. But does any of that go to suggesting that Cook did not perform this murder? I believe that a jury could rationally have found, and this is why I say that this Maskey issue impacts other issues, that a jury could rationally have found that Cook was present, that Cook, as he said, was partying and things got out of hand, but that there was no proof of premeditation. And the state court talked about premeditation in the terms of the statute. And there's a statute which says it's not premeditation if quarrel or passion, but the state had to prove the existence of premeditation. Again, if you take Maskey out of the equation, yes, Cook was there. Although, I mean, theoretically, the jury could have believed other testimony that said that he was not. Well, what physical indications are there of torture? There's injuries on Mr. Ramos, right? Yes. With burning and cutting and all of that that are consistent with what Mr. Maskey said happened. The issue is what evidence is there that Mr. Cook committed the torture? Again, if you read the fingerprint testimony and if you read the serologist's testimony, they could not identify Mr. Cook's fingerprints on the pipe or table leg that was used or said by Maskey to have been used on one of the murders. They could not identify fingerprints of Cook on the stick that Maskey said was used as an instrument of assault against one of the victims. They could not identify bodily fluids. And Mr. Cook's defense was he wasn't there, right? His defense was that he wasn't there or lack of proof, in essence. And to the extent that you want to examine the case through the prism of what the defense actually was, one has to remember where he was in terms of the ability to present a defense by the time he got to the trial, which raises the issue of the voluntariness of his waiver of counsel and the ability that he had or did not have to have witnesses interviewed and to present any evidence. The question that you're asking, if the Court please, I think is another sort of overarching implication of the Maskey confession. We are all looking at a story that's a gruesome story. There's no two ways about it. We're looking at a story that, if believed, obviously justified the verdict. And to go to another issue, in the face of the lack of the mitigation evidence, certainly explains a death sentence. But if Maskey is to be disbelieved, and even putting aside the consistency plea, there were instances of impeachment, if he were disbelieved, we're not looking at the same kind of gruesome set of facts. Because there is nothing else, nothing else other than what Cook said happened and his presence that ties him in any way, shape, or form to all of the beatings and tortures and so forth that are described by the Arizona Supreme Court in the opinion. You say there's nothing else. You're considering Cook's statement to the police, right? Well, and again, the impact of the fingerprint analyst and the serologist. But Cook did, but there was evidence introduced that Cook made certain admissions to the police officer. Yes. Yeah. We were partying, things got out of hand. I killed one, my roommate killed the other. Yes, that's it. That's it. How's that inconsistent with what Mr. Maskey said? Well, number one, it doesn't say anything about who committed the killings under what sort of circumstances and how quickly. Where does one get premeditation from that cryptic statement? What is it that, is there any showing of what Maskey would have said if he allegedly did not feel restricted by the court's limitation here? I cannot point to anything in the record, but I hasten to add Maskey has never been from that date to this, still isn't, in a circumstance where he cannot be hauled back to that county, prosecuted for that murder, and sentenced to death. How could he ever tell us? How do we know? We don't. And that's the advice I submit of intimidated under this kind of circumstance. I mean, there are other cases. Is Maskey still in custody? I don't know the answer to that, perhaps. Mr. Catani does. He had a 20-year sentence. In the State system, 20 years may not mean 20 years, but in any event, that was his sentence. Your Honor, what I have said, I think, strongly supports a finding that the State court determination on the refusal to give the Beck, what I call the Beck instruction, was an unreasonable determination. Because what the State court did was to reiterate what we've been talking about now, and that is, well, Maskey testified to this, and Maskey testified to that. And Maskey testified to other things, and therefore, there was no evidence of quarrel or sudden heat of passion. And therefore, there was evidence of premeditation. And the court said the circumstances of the killings supported the premeditation. And again, I say that when you look at the case, taking the rest of the evidence, recognizing that the court's decision on the refusal to give the Beck instruction, that the forensic evidence does not tie Mr. Crook to any of these deeds, and take his admission, I say that a rational jury could have found second. And again, think about... Well, let's explore that. You know, obviously from the standpoint when courts have to give instructions at the end of it, clearly there's, you know, there's several ways. If there is some sort of lesser and there's any evidence of it, you've got to give it. Yes. However, we have at the end of the trial when the judge is deciding how to instruct here, we... The defense that your client has put forth is that he didn't do it and he wasn't there, right? Yes. Okay. That's what he argued. So what the court has to look at is it's got, you know, obviously Maskey's testimony doesn't give... It doesn't give evidence that he did not eat or quarrel or, you know, that's in acts of passion. But then also everything else that you have in terms of the condition of the bodies, all of, you know, all of that. You know, what in the record says that there was some, you know, that there was something like that? What evidence would the court have to go on there? Other than Cook's statement, I don't think there is any, but let me remind the court that that's not the only way that one gets to a Beck instruction. That is sort of an exception to premeditation is reflection and so forth. Premeditation is not quarrel or sudden heat of passion. That's not the only exception to premeditation. There is a burden of the state to prove that Dan Cook committed these killings with a state of mind that permitted him to reflect and to form the intent, not to form the premeditation, not simply the intent, but the premeditation to kill. And what I'm saying, if the court please, and you're saying his defense was he wasn't there, he didn't do it. Well, let's remember that by the time he stood up to argue the case, he had already. Well, I guess what evidence of any substance is there that says that these were not premeditated? What evidence is there? What evidence is there, I submit to the court, with all due respect, is there other than Mr. Matzke's testimony that says that he did premeditate? I don't think there is any. I really don't. What about the condition of the bodies, that there's more than one person? You can't do two people at one time. The location of the bodies in terms of secreting them, what about all of those things? How are they evidence that there wasn't premeditation? They're not evidence that there wasn't. What I'm saying is that contrary to what the state court said, the forensic non-Matzke evidence didn't tie Mr. Cook to that. There were implements. There was a pipe. There was a stick. There was a small stapler that had his fingerprint on it, but that was not an arguable whether that was actually an incident of torture. There's been lots of reference to stapling. Well, that wasn't the physical evidence that Mr. Ramos's penis was stapled? No. Physical evidence in the sense that there was a stapler? No. Physical evidence was twofold. Number one was that there was a stapler, and it did have Robert Crook's fingerprint on it, I believe. Number two, there were two puncture wounds that the pathologist testified were consistent with stapling or consistent with, on cross-examination he was asked, consistent with a piercing, a ring. Again, the jury would be free to accept one or the other of those interpretations of the evidence. Counsel, most of your argument so far this morning has been related to the plea agreement and issues that sort of surrounded it. Did you want to raise any other issues? I do, Your Honor, although I do think that these are very important. Surely. I'd like to talk about the voluntariness of his, of Crook's waiver of counsel, because I think that the Ferretta issue. Yes. The Ferretta issue, yes. The post-conviction court wandered off track on that issue. The post-conviction court said, number one, I see that there are federal cases which may say that I should have inquired at the time that Mr. Crook made the choice, why he was making the choice, but I don't think that that is a requirement for the state court. And number two, he said, I don't think Mr. Crook has proven the two prongs of the Strickland test, i.e. that his counsel was, in fact, ineffective, and therefore I'm denying the claim. And that was unreasonable because the issue was not whether, in fact, Mr. Keller had been ineffective on an overall basis at that time, although it seems to me the evidence of such is overwhelming. And I think that the PCI court, the sentencing court's reference to a sudden flurry of activity just sort of belies credulity. But that's not the issue. The issue is what was in the mind of Mr. Crook? Why did he make that choice? Was it voluntary? And the evidence was that it wasn't voluntary because he saw a man who was, number one, he was incompetent and known to the trial judge to be incompetent at the time he appointed him. Number two, he wasn't doing anything. Number three, his investigator wasn't doing anything. And he became concerned. And he thought at that time, and this was about nine days before the first trial date that he thought was going to be a real trial date, he thought that his counsel was going to be offering an insanity defense, which he knew and everybody else knows was not at all viable. He said, I have only, the only choice I have is to represent myself. And that's why I did it. And the issue is not whether, for example, there are particular scripts that are chiseled in that require, the issue is not whether counsel was, in fact, ineffective or not. The issue is whether, in fact, under the standards of Feretta, this man made an intelligent choice. And much of the case law interpreting and applying Feretta has been that the defendant needs to understand the import, the ramifications of what he's facing if he made the choice. Well, is there any evidence in the record that he sought to ask for substitute counsel? Did he ever ask for the appointment of other counsel? He did not. He testified that he thought he either had to accept Mr. Keller or he had to do it himself. Well, okay, but that's after. He doesn't tell the judge at the time, the reason I'm asking you to represent myself is because I don't feel like I have any choice. Right? He doesn't say that. He did not say that. You're right. And he testified that if anybody had ever asked him, he would have, but he did not. Well. Well, but again, Your Honor, the issue is not, I submit, the issue is not whether there had to have been that explicit exchange, but whether this was a voluntary decision. And again, we could talk about the import of that piece of evidence, for example, and maybe if the post-conviction court had undertaken that kind of analysis, I might have more of a problem with was this a reasonable determination. But the determination was unreasonable because the post-conviction court just went off path. As I said, the post-conviction court went to the issue of whether, in fact, there was ineffectiveness, and the post-conviction court went to whether there was a script or there wasn't a script, should he have asked it or should he not have asked it. I think if the court had been focused on was this a voluntary choice and had made any kind of a factual finding based upon any of the evidence, including a scrap of testimony from a fellow. Is there a Supreme Court case out there that says that when you're taking a Ferretta waiver, you have to say, are you doing this because you are unhappy with your lawyer? No, of course not. At least I haven't found it. Okay. But the Supreme Court precedent that I think applies is not an embellishment on Ferretta, it is on Ferretta, that is to say a knowing and intelligent waiver. And I think that no State court has made a reasonable determination that that was the case. And that, I think, is the crux of the issue. There are other issues. Obviously, I do want to save some of my time for rebuttal, but if there are questions the Court has, I'd like to respond to them. Not at the moment, counsel. You may reserve your time. We'll hear from the State. May it please the Court. My name is Kent Catania. I represent the State of Arizona. I'd like to start with the Matzke plea agreement. And the Court has correctly pointed out that there is simply no United States Supreme Court authority that would suggest that there's a problem with this type of agreement. Well, let me, let me say this. Let me explore that with you a little bit. It seems to me that, in essence, what the agreement has the potential to do is to coerce or intimidate by saying, you've given us a statement. You've told us that Cook committed these torture murders. And if you change your story, we don't have to figure out which one is true. The plea agreement is off. And so if, and I'm not saying initially that necessarily he lied. But let's suppose that he did. He's got to stick with his story to save his own skin. So if someone puts the blame elsewhere, in whole or in part, and has this plea agreement, he's going to swear to it forever and ever because otherwise he's in big trouble. So I'm concerned about the structure of the plea agreement itself as being coercive or intimidating in the sense that it locks in the first statement that pleases the prosecutor, that the prosecutor at the time thinks is true. I'm not suggesting any bad action. But it might or might not actually be true. And so I'm concerned about whether that kind of an agreement violates due process and specifically whether it's the kind of intimidation that the court was talking about in Mooney. If I could, Your Honor, I don't think this agreement locks in the prior statement. I think that's the practical effect. But if you read the ---- That's what I'm talking about is the practical effect. I'm not reading it word for word. In the specific paragraph that you referenced earlier, the third paragraph, it says the making by John Matsi of two or more statements during such testimony or interviews. This is suggesting prospective statements, testimony or interviews. We're not locking him in. We're not saying you automatically have to testify to what you've said before. And that's been a concern that courts have said. We want the focus to be on truthful testimony as opposed to just locking you in to what you've said. But this one seems to be referencing prospective statements. And the start of the paragraph, the focus is on provide truthful responses. And I think as the court pointed out ---- Well, the two sentences of that paragraph can be read to be at cross purposes if you read it the way I have, which is you're supposed to tell the truth, but on the other hand, you have to stay consistent because if you're not consistent, that also is a violation of the agreement. So someone who has a choice between being consistent and truthful can't live up to both. Well, I think that's a concern that's just inherent in this type of plea agreement. But that happens all the time. And the remedy, in rereading the Daley case that I cited in the brief, it cites to a U.S. Supreme Court decision, HOFA. It points out that the proper remedy is thorough cross-examination. You point out that this person is testifying pursuant to a plea agreement, and this is what they would face. And that's, I guess, my only response is that the focus in all of these cases, the important thing is that the defendant be given a thorough opportunity to cross-examine and point out all of the incentives that this particular witness has to lie. In the cases that counsel has referenced, there's been a suggestion that there's been perjured testimony. And that's certainly not the case here. But I guess my point is, if an agreement is structured in such a way that it is not designed to ferret out perjured testimony, isn't that analogous? Well, I guess, from my perspective, there has to be some indication that there's perjured testimony. Well, that might go to whether there's been prejudice from a violation, but I'm talking initially about whether or not there is a due process violation to begin with in the structure of an agreement. It may be, for example, that an agreement like this is coercive and improper, but on the other hand, we know that the person was being perfectly truthful, so it hasn't harmed you in any way. But that seems to me to be a different piece of the puzzle, not the initial inquiry. Well, I guess I go back to I'm just not aware of any Supreme Court authority or any Federal authority that would suggest that even this provision, when we're just talking about when you make prospective statements, you're going to have to be consistent. And I think that does just go to we're not going to have to prove which one of them, if you make some statements in the future, we're not going to have to prove which one of them was false. Your plea deal is off. But I think it's just the long line of cases that suggests that it is okay to get testimony from a co-defendant. And everyone understands that there's a coercive nature to that. That's inherent in giving someone a deal. That's why they came forward. They got a good deal. And it's important, and I don't know that I pointed out in the brief, Manske was deposed prior to trial. Cook did a very thorough job of cross-examining him. And I think that's all the Constitution requires. That's all the Supreme Court authority that I've seen and the Federal cases that I've seen require. The only cases that he's relied on have been a State case, a State versus Fisher, that involved a situation where there's no testimony that was known to the witness later said that there are things that I wanted to say but that I did not say. It's more analogous to there's perjured testimony. The State knows there's something else out there. And the Fisher case really could have come up just as newly discovered evidence or it's really not an indictment on this type of plea agreement. If that were the situation, if the State knows that the evidence that Mr. Manske presented was untrue, then there would be a problem. But here we had an evidentiary hearing at the post-conviction stage. They interviewed Mr. Manske again. The pretrial interview, his trial testimony, the post-conviction proceedings allowed for another interview, and he testified at the post-conviction proceeding. And each time he's testified consistently. And again, as the Court has pointed out, Mr. Manske's testimony was entirely consistent with Cook's own confession. We got to partying. Things got out of hand. Now two people are dead. My roommate killed one of the victims. I killed the other. So there's simply nothing that would suggest that there's anything inaccurate about Mr. Manske's testimony. The inaccuracies that counsel has pointed out really don't have anything to do with Cook's involvement. They're details that are not really relevant to Mr. Cook's case. And I would point out the other. In Arizona, there's been a subsequent case, post-Fisher, that I neglected to reference. It's State v. Rivera. That's 109-P3-83, in which the Arizona Supreme Court pretty much distinguished Fisher based on the fact that there was evidence that there was additional evidence that would have come in had this person not been under the plea agreement. But otherwise, adopted a rule that these types of agreements are not improper, that the focus should be on providing truthful testimony. Counsel, if you want the court to look at that Arizona case, please see the deputy clerk afterward and give that citation triplicate here and serve your opponent. Yes, I will. I'd like to, if there are no other questions on the Manske agreement, I'd like to spend a few moments on the Beck issue. And in rereading Beck yesterday, it seems to me that Beck does not necessarily implicate this case in any way, in that Beck involved a situation in Alabama where there's an automatic death penalty. The jury only had the choice of either acquitting the defendant or convicting him of a crime and being required to sentence him to death. And the United States Supreme Court decided Beck in this Eighth Amendment context that there should be another option other than death or acquittal. And in Arizona, we've never had automatic death. And this wasn't something that's in the brief. I apologize for that. But in reading Beck, it struck me that this isn't the only Supreme Court authority that we're talking about. And that really relates to a situation where there's automatic death. And I don't think that's the case in Arizona. Certainly, the jury wasn't even doing the sentencing at the time of Mr. Cook's trial. They were just going to convict him of something that would then subject him to a possible death penalty, but there were other available options to the trial court. Under State law, there is an entitlement to a lesser-included offense if the evidence supports it. But that's not an issue for this Court to review in Federal collateral review. But certainly, there was no evidence that would have supported the notion that there was a subject order or heat of passion. And Mr. Cook's defense, you really have to kind of focus on his opening statement and his closing argument. And it really was, I wasn't there. I didn't do it. And there's simply no evidence that there was some sort of sudden quarrel or heat of passion. So even under State law, there was no entitlement to a secondary murder instruction. On the, I guess the final issue that I'll address is the Feretta issue. And the Court has pointed out that Mr. Cook never suggested that his reason for wanting to represent himself was dissatisfaction with counsel. In fact, during the colloquy, Mr. Cook said, Mr. Keller has been working hard for me. And I think it's clear that there is no United States Supreme Court authority that suggests that you have to ask, why are you doing this? And that's for obvious reasons. I think if, for example, the defendant is simply planning to lie and his counsel knows that, the Court's not going to ask and require the defendant to say, well, I want to perjure myself and counsel won't let me do that. That's not part of the Feretta inquiry. And in this case, the notion that Cook thought that Keller was his only choice is belied by the fact that at the post-conviction, I'm sorry, not even at the post-conviction hearing, at the time he elects to represent himself, there's a discussion about advisory counsel. And Cook indicates that he'd like to have someone else be his advisory counsel, that he has someone in mind. And at that point, the trial court says, well, there are two people on my list. Mr. Keller's one, and there's another person. This person that you're asking for is not on my list. If you're saying that you don't want Mr. Keller, I'll let you go with this other person. And so it's clear at that point that the Court would have entertained a request to have someone other than Mr. Keller. And if Cook had said, gee, I don't want Mr. Keller to represent me, there was obviously that possibility. There could have been that discussion about having this other attorney who's on the list available there for the trial court to appoint. So Cook clearly waived this claim that, well, it's not really a waiver. There's simply no requirement under Feretta that the Court do something different than it did. It went through an exhaustive litany explaining the perils of representing himself, just page after page, and discouraging Cook from doing it. Nevertheless, Cook made the decision to represent himself. Let me ask you a question that follows up on one that I believe Judge O'Scanlan asked earlier. Has Mr. Matzke completed his 20 years or whatever it turned out to be? The time was in 1987, and I assume the conviction wouldn't have been until sometime. I'm assuming he's coming up for it. I haven't heard. He was still in custody at the time of the post-conviction hearing, but that was some time ago, and I haven't checked since then. So under his agreement, theoretically, if he were to testify now, with what he said at trial, his agreement still would be subject to rescission. I haven't thought through that. I assume that the agreement is still there. Yeah, I mean, let's say, you know, it's not unheard of that someone, okay, so now he's done. He's done his 20 years. He's out, and someone's death is imminent, and he says, I lied. I really did both of them. Mr. Cook wasn't there. My assumption would be that the State could withdraw the plea agreement. As I said, I haven't really thought that all the way through. But if someone, for example, had been released early, I don't know if there would be a difference if he's serving a 30-year term. If he were serving a 5-year term, it seems to me the agreement would be there, and it would require that he be consistent prospectively, and prospectively includes time after he's finished serving his sentence. How would one go about determining whether his new testimony was truthful or not? Well, I think if he's making inconsistent statements, that was the point I think the Court was making, that if he's now going to say something that's inconsistent with what he did before, we could withdraw. The State could move to withdraw the plea agreement and try him again. That would not necessarily implicate Mr. Cook's case, again, given the fact that Matzke's testimony was entirely consistent with Cook's statement to the police. And it's also important to keep in mind that Cook was there at the apartment. Matzke went to the police shortly thereafter. The bodies are still in the apartment. Cook's there. So this isn't much of a stretch. Cook's defense was, I wasn't there, but he is there in the apartment. When they go early the next morning, he's told his cellmate, I wasn't there, but he's never given any indication where he was. And, in fact, he's there shortly after, and he makes a statement to the police. We got to partying, things got out of hand, now two people are dead, I killed one of them. So the Matzke, they're simply, I guess I'm not clear what Matzke would possibly, how he would change his story. If he were to do so, they would certainly be able to raise a claim of newly discovered evidence. If Matzke does change his story, that would be newly discovered evidence that may or may not entitle him to a new trial, depending on what he would say. But that's entirely hypothetical. Matzke has never suggested, notwithstanding multiple opportunities, multiple times that he's been questioned and interviewed. But I guess that does go back to your question, and it seems to me that he still would be under the constraints of the plea. Would he have a double jeopardy argument? I don't know that there is. I apologize, I haven't thought all the way through, but it still seems to me that that is, it's simply there, and it would be the same regardless of the length of his sentence. If the court doesn't have any, let me just see if I had any brilliant pearls, I doubt it. Just one argument raised in the supplemental brief, in terms of excusing a procedural default based on ineffective assistance of PCR counsel and Cook cites to the Moorman case. And Moorman relates only to a situation where PCR counsel had a conflict in alleging ineffective assistance of appellate counsel, because it was the same attorney who had been the appellate lawyer and the post-conviction attorney. And in this case, that's not the situation here. Cook was represented by a different attorney at trial, at sentencing, on direct appeal, I'm sorry, different attorney on direct appeal, a different attorney at the PCR stage. And so we don't have the Moorman issue. Anything further? I think that's all I have, Your Honor. Thank you, counsel. Mr. Meehan, you have some reserve time. The question about Massey's current status is an interesting one, because I think it's fairly clear that without the State doing something, that he would be subject to being re-prosecuted because, A, the plea is taken away, and, B, there's no statute of limitations. On the other hand, it occurs to me that the violation here is Cook's conviction with coerced testimony, and the remedy would not be simply to wipe out Massey's possibility of testifying, but simply that he could not be retried if Massey were to testify under the gloom, if you will, of that continued provision of the agreement. In other words, if this Court agrees with me on this principle and it grants relief, the State would be free to say, well, he's sentenced, he's served for 20 years, it's in our interest to have him testify. We will simply tell him that that provision of the consistency agreement no longer applies and all he has to do is testify truthfully. Would he have a double jeopardy defense? I don't think he would because there's a very famous case in Arizona in which there was a guy who entered into a plea agreement and he testified against several people in a very famous bombing murder called the Don Bowles case, and then he went back on his plea and he was prosecuted and sentenced to death. So I think that it's problematic. I have to say it's problematic. However, that cuts for my client. I'm not sure. The issue of prejudice, I submit, again, we don't know as long as this consistency obligation is there. And certainly, Maskey never understood and nobody who's really held or interpreted this agreement to say it was prospective only. But as long as he's under that cloud, there is no way to know what the prejudice is. The prejudice, I submit, is the testimony itself was prejudicial. You can't say, well, that was harmless error. The testimony is invalid if we're correct on the constitutional provision and it was prejudicial because of, obviously, the major import that it had. We cited in our brief, this is on counsel's reference to State v. Fisher, or People v. Medina, which is a California case, which has a very good discussion of these kinds of things and grounded on due process. And the distinction is truth-telling versus you've got to be consistent. When counsel says the remedy is cross-examination, et cetera, et cetera, that is a statement that the courts make when they have validated plea bargains, basically saying we'll give you a good deal if you'll testify in the case, not the consistency. Beck, of course, doesn't apply only to cases where there's an automatic death sentence. That's a principle of constitutional law that is just there. Cook's defense was that I wasn't there and I didn't do it had to be that much and could not have been taking advantage of a Beck instruction because it had been refused. And finally, on the argument that counsel makes about- Well, Cook didn't say it. Cook, the reason he wanted the second degree was he said Maskey got second degree, so give me that instruction, right? He did say that. But as I say in my brief, the issue is not whether counsel or pro se made the right argument at the time. The issue is whether the evidence would rationally support, not whether we think it's a reasonable interpretation, which is what the state Supreme Court said, but whether the evidence would rationally support. And then finally, in terms of the facts that counsel argued about the Pareto issue, if the state PCR court had, in fact, made a determination that this was a reasonable waiver, then I'd have a different problem. This court, I submit, cannot say, well, we're going to pick up the issue about advisory counsel with the evidence about advisory counsel or this or that and find that it was a reasonable determination. If I may say one other thing, the issues of the lesser-included offense, the issues of the comment upon the evidence, the issues upon whether Maskey could have been disbelieved, and maybe one or two other issues, I would urge the panel to do what I did Monday afternoon and then yesterday morning, and that is go back and reread the trial transcript, excerpts 12, 13, 14, 15, from the opening statements through the end of final argument. It took me about four and a half hours to read, you know, focusing in on the issues. And I submit that it really leaves the correct impression about how prejudicial the ‑‑ and I apologize, I guess I'm not doing proper rebuttal, but how important the comment on the evidence issue is and how valid and rational it would have been for the court to have given a lesser-included offense. When you take it and put it together, and there's no substitute for doing that, and I would ask the panel to do that. Thank you, counsel. The case just argued will be submitted for decision, and the court will adjourn.
judges: O'scannlain, Graber, Callahan